## UPROAR CO. v. NATIONAL BROADCASTING CO. et al.*
### No. 3050.

Circuit Court of Appeals, First Circuit.
Jan. 7, 1936.

*Writ of certiorari denied 56 S. Ct. ——, 80 L. Ed. ——.

McLELLAN, District Judge, dissenting in part.

Israel Gorovitz, of Boston, Mass. (Arthur Berenson and Bernard Berenson, both of Boston, Mass., on the brief), for appellant.

Stuart C. Rand, of Boston, Mass. (Warren B. Manhard, of Boston, Mass., and A. L. Ashby and E. Stuart Sprague, both of New York City, on the brief), for National Broadcasting Co.

Melville F. Weston, of Boston, Mass. (Leland Powers and Powers & Hall, all of Boston, Mass., on the brief), for Texas Co.

Before MORTON, Circuit Judge, and MORRIS and McLELLAN, District Judges.

MORTON, Circuit Judge.

This is an action at law to recover damages for an alleged conspiracy between the defendants (1) to interfere maliciously with contracts made by the plaintiff with certain broadcasting concerns to advertise its pamphlets and books; (2) to prevent the printing and distribution of such pamphlets and books; and (3) to prevent the advertising of them over the radio. The alleged purpose of the conspiracy was to prevent the plaintiff from carrying out arrangements made between it, Ed Wynn, and Keenan Products, Inc., a corporation owning certain rights transferred to it by Wynn, for the advertising and selling of certain literary productions of Wynn. There is a second count alleging a conspiracy under the federal anti-trust laws to interfere with interstate communications.

The defendants pleaded equitable defenses. That of the Texas Company alleged, in substance, that the plaintiff had no such property rights in the productions of Wynn incorporated in the pamphlets and books as enabled it to maintain the action, and that its attempted advertising and sale of them was in violation of the defendants' rights. The prayer was for an injunction against any attempt on the part of the plaintiff to publish, advertise, or sell the literary productions in question. The answer of the National Broadcasting Company further alleged that the pamphlets and books published by the plaintiff made use of the name "Graham McNamee," in which the Broadcasting Company had exclusive rights. It prayed that such use might be enjoined. In the court below the equitable defenses were sustained, and the plaintiff has appealed.

The first question is whether any ground of equitable defense is pleaded; i. e., whether the defenses stated ought not to have been made in the action at law. Inasmuch as the plaintiff's conduct is alleged in the answers to have

been illegal and tortious and an interference with the defendants' property rights, and as it is of such character as, by the settled practice in equity, will, if illegal, be enjoined, and as injunctions were prayed for, i. e., an affirmative relief not obtainable in the action at law, we think that the equitable defenses were properly pleaded and were properly heard in advance of the trial of the action at law. There is no question but what they related to the subject-matter of the plaintiff's action; indeed they go to the root of it. It is the practice in cases in which equitable defenses are properly pleaded in an action at law for the trial court first to determine the equitable issues, and, "Once having assumed jurisdiction, it [the equity court] will determine all rights, legal or equitable, which are necessary to settle the equitable issues." Wilson, J., People of Porto Rico v. Livingston, 47 F.(2d) 712, at page 721 (C.C.A.1). See, too, 28 U.S.C.A. § 398, Equity Rule 23, 28 U.S.C.A. following section 723, and Liberty Oil Co. v. Condon National Bank, 260 U.S. 235, 43 L.Ed. 118, 67 L.Ed. 232.

We come, therefore, to the merits of the controversy between the parties. The basic facts are not in dispute. The Texas Company is a large dealer in gasoline and related products. It made contracts with Ed Wynn, a well-known actor and comedian, to give a series of radio broadcasts in advertisement of its goods. The broadcasts were to be given weekly, and under the first contract Wynn was to be paid $5,000 for each one if he furnished the program for it, $3,500 if he did not. By other contracts the Texas Company arranged with the National Broadcasting Company for the use of its system for these broadcasts and for the services of Graham McNamee, a well-known speaker over the radio, who was under contract with the Broadcasting Company, whereby it was solely entitled to his services in broadcasting and to all public uses of his name. The arrangements between the various parties involved many details which were covered by the agreements, but which it is unnecessary to go into. The original contract between Wynn and the Texas Company was for thirteen performances; but by additional contracts and options, which were exercised, over fifty additional performances were arranged for on substantially the same terms, except that the later contracts did not contain the provision for reduction in compensation if Wynn did not furnish the programs. For the entire series Wynn received, if he furnished the programs, over $350,000. The script which Wynn prepared required a second speaker. McNamee took this role. The total expense to the Texas Company for each performance appears to have been about $13,000.

The performances were highly successful; Wynn's jokes and witticisms made a great hit with the public. He or his associates apparently conceived the idea that it would be profitable to realize on this good will by publishing his programs in pamphlet form immediately after they had been delivered over the radio. The plaintiff corporation, under arrangements with Wynn and with Keenan Products, Inc., and one Leavitt, who were interested in the copyrights or other phases of the matter, undertook to do this by a weekly pamphlet entitled "Uproar," which was sold for 10 cents per copy. The Uproar Company attempted to advertise this pamphlet over the radio shortly after the conclusion of the performance for the Texas Company, which was contained in the pamphlet, had been given.

The Texas Company objected to this on the ground that it owned the subject-matter of Wynn's broadcast for it and on the further ground that the publication of the pamphlets would injure the advertising value of the broadcasts. The National Broadcasting Company objected on the ground that the pamphlets used Graham McNamee's name, under the abbreviation "Graham," in violation of its rights. There is no doubt that the word "Graham" was used in the pamphlets, nor that it was there intended to refer to Graham McNamee, and was so understood by the public. As has been said, McNamee took part in the broadcasts.

The first question on the merits is whether the Texas Company acquired exclusive rights in the personal script prepared by Wynn for use in the broadcasts or whether that right remained in him. The District Judge was of opinion that these rights belonged to the Texas Company. As was said in a somewhat similar case, "It is a question of fact to be derived from all the circum-

stances of the case what is the nature of the contract entered into between the parties." Halsbury, L. C., in Lawrence & Bullen v. Aflalo, L.R., [1904] A.C. 17, at page 20.

The contracts, which are all in writing, make no explicit provision on this point. Under them, the Texas Company "hereby agrees to and hereby does employ the party of the second part (Wynn) as the principal featured star of a radio broadcast to be given for —— consecutive weeks once a week for one-half hour beginning (date named) at a salary of ($5,000) per week for each and every week," etc. Wynn's obligation was "to render service as an artist," and to supply the necessary personal scripts for broadcasting over the radio, etc. "* * * He agrees to render such service to the best of his ability," and, in the later contracts, "in the manner as heretofore rendered." The first contract further provided: "6. It shall be the right of election of the party of the second part (Wynn) however to determine whether or not he will perform in full the services of supplying the program and arranging the same, subject to the supervision and approval of the party of the first part, which is a part of the duties the party of second part (Wynn) agrees to perform during the first thirteen weeks for same. * * *" "If he shall elect not to perform such services of supplying the program as herein recited, because of the fact that he shall be actively engaged in playing upon the speaking stage, then he shall receive the sum of $3,500 per week for each and every week that he shall broadcast in the optional period of said fifty-two weeks herein mentioned, but in that event he shall be known as the star and high-spot of the said broadcast," etc.

The District Judge, applying the contracts to the circumstances surrounding them, held that they in effect made Wynn an employee of the Texaco Company for advertising purposes and that the literary programs or script which he prepared for that purpose became its property. He regarded the situation as analogous to one in which an author had been employed to prepare manuscripts for publication, or to one in which an inventor had been employed under salary to make a specified invention. See Lawrence & Bullen v. Aflalo, supra; Dielman v. White (C.C.) 102 F. 892; Standard Parts Co. v. Peck, 264 U.S. 52, 44 S.Ct. 239, 68 L.Ed. 560, 32 A.L.R. 1033. It does not seem to us, however, that Wynn's services were of that character. Wynn was not employed to prepare material, but to give a show. The proposed show involved two elements, Wynn's personality, skill, and reputation as an actor and comedian, and the material which he used. It was to be entirely a spoken affair. The essential thing about it was that it should attract people to listen in, so that they would hear the Texas Company's advertising which was given in connection with it. The script was prepared for that purpose. There is nothing in the contracts to indicate that the Texas Company regarded the scripts as of value to it after the performance was over or desired to obtain the literary property in them. That property originally belonged to Wynn, and he did not lose it unless the contract carried an implied assignment of it to the Texas Company.[1] We do not think that any such assignment is implied from the language of the contracts or the relations of the parties. The literary property in the scripts prepared by Wynn remained in him. We do not overlook the fact that Wynn was paid $1,500 more if he furnished the scripts. The Texas Company apparently assumed that script obtained elsewhere would cost about that amount. The inferences from this fact seem to us too speculative to be controlling. It is impossible to say who would have furnished the script if Wynn did not, nor on what terms and conditions with respect to the title to it.

As the literary property in the scripts belonged to Wynn, he had the general right to publish them. But this right was not unrestricted. As the scripts were prepared under contracts with the Texas Company for that company's advertising and Wynn had been paid for that use of them, plainly he was not at liberty to make any other use of them which would in any way weaken or interfere with that for which they had, so to speak, been sold. The principle is

[1] In England by statute the presumption is the other way in certain cases; i. e., that the property passes unless expressly reserved. See Lawrence & Bullen v. Aflalo, supra; Sweet v. Benning, 16 C.B. 459.

well established: "That in every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing." Hubbs, J., Kirke La Shelle Co. v. Paul Armstrong Co., 263 N.Y. 79, 188 N.E. 163, 167. See, too, Manners v. Morosco, 252 U.S. 317, 40 S.Ct. 335, 64 L.Ed. 590.

█ The final question is whether the publication and sale of the plaintiff's pamphlets "Uproar" did in fact have that effect. The District Judge found:

"The plaintiff can have no greater right than Wynn or McNamee. Both defendants complain that the plaintiff, in publishing 'Uproars,' has appropriated and will appropriate the good will which the defendants have, at large expense, succeeded in creating and to which the plaintiff has contributed nothing. In other words, that the plaintiff, for its own profit, is seeking to take an unfair advantage of the popularity of widely advertised programs, the proprietary interests in which belong exclusively to the defendants under their respective contracts with Wynn and McNamee.

"This misappropriation and use by the plaintiff tends to impair the value of the exclusive rights which the defendants have acquired by cheapening the whole advertising program. There was evidence tending to show that those who were in the radio audience when the program was on were led to believe that the plaintiff's publication was put out by the defendants, or one of them.

"The defendants say, ·with justice as I see the matter, that such a use would 'detract from the unique quality and artistically complete effect of the defendant's advertising. It would tend to cause confusion in the minds of the public with respect to the relationship between the plaintiff and the defendant, and to create some degree of impression that the defendant was responsible for what the plaintiff might do.' The cogency of the argument lies in the fact that the defendants have no control by way of censorship, or otherwise, of the matter that may appear in 'Uproars.' I have no hesitation in finding and ruling that the plain-

tiff is making a commercial use, wholly unauthorized, of the script and of the name 'Graham.'"

It will be observed that the District Judge's findings dealt not only with what he regarded as an unpermitted misappropriation of the scripts, but also with the effect of the plaintiff's use of them on the Texas Company's advertising. While the evidence on this point is not very full, and perhaps not very satisfactory, we think it supports the District Judge's findings. From an inspection of the "Uproar" pamphlets, which were shown to us, we think it might well be found that they were cheap and flashy, and, if attributed to the Texas Company, as apparently they were to some extent at least, were calculated to injure the effect of its advertising.

█ It is clear that the plaintiff had no right to use Graham McNamee's name in its publication, either in full or under the abbreviation "Graham."

It follows that the plaintiff cannot maintain the present action, and that the first clause in the decree enjoining it from doing so was right. The second clause in the decree enjoining the plaintiff from publishing, etc., should be modified by adding at the end' thereof the following: "In any way which injures or interferes with the benefits which the Texas Co. might derive from its advertising under its contracts with Wynn." In all other respects the decree is affirmed, with costs to the appellees.

The decree of the District Court, as modified by this opinion, is affirmed, with costs to the appellees.

McLELLAN, District Judge (dissenting).

I am in accord with the majority view that, notwithstanding his contract with the Texas Company, the literary property in the scripts belonged to Wynn, that he had the right to publish them, and that this right was not unrestricted.

While recognizing the principle that a contractor impliedly promises that he will not use retained property in such a way as to defeat the purposes of the contract, I doubt whether in any event we should go as far as the majority opinion suggests in the proposed injunction. Be this as it may, we all agree, in substance,

378

that the plaintiff, by virtue of mesne assignments from Wynn, has a restricted right to publish the scripts, and I cannot see why, on this record, the plaintiff should be enjoined from prosecuting its action for an alleged unlawful interference with that right. I should suppose that, if the defendants made out a complete defense, they would be entitled to a judgment, not an injunction. But they are entitled to neither. The majority concedes such ownership in the plaintiff that I think it cannot be ruled as a matter of law at this stage of the proceedings that the plaintiff has no cause of action for interference with its ownership and restricted right to publish the Wynn productions. And this entirely apart from the jurisdictional question, as to which I am not in accord with the majority of the court.

The nonownership of the plaintiff alleged in the equitable answer is, for reasons already stated, out of the case. The restricted ownership set up in what the defendants call an equitable defense is a matter which would have been in issue in the law action if no such thing as an equitable defense ever had been provided. May a defendant, by raising a legal issue, by calling it equitable, and by asking for an injunction of the type described in the majority opinion, deprive the plaintiff of a trial at law? In spite of judicial utterances to the effect that the test of the right to a trial in equity on a plea to an action at law is whether the averments of the plea are such as to constitute a proper basis for a bill in equity, I think this question should be answered in the negative. For this additional reason there should be no injunction against the prosecution of the action at law.

I doubt also whether the appearance of the name "Graham" as a participant in the dialogue constituting the script should be regarded, under the circumstances here presented, as preventing the plaintiff from publishing the Wynn compositions. At any rate, the plaintiff had the right to publish and· sell the script by deleting the name in which the National Broadcasting Company had certain rights by contract with Graham McNamee.

In conclusion, I think the court was without jurisdiction in equity to hear the case over the plaintiff's protest, and that no injunction in any form should issue.