Helen WALKER, Plaintiff-Appellant,

v.

UNIVERSITY BOOKS, INC., et al., Defendants-Appellees.

No. 77–2141.

United States Court of Appeals, Ninth Circuit.

June 18, 1979.

Rehearing Denied Sept. 6, 1979.

Edward B. Gregg, Gregg, Hendricson, Caplan & Becker, San Francisco, Cal., for plaintiff-appellant.

Vasilios B. Choulos, Belli & Choulos, San Francisco, Cal., for defendants-appellees.

Before BROWNING and WALLACE, Circuit Judges, and CURTIS,* District Judge.

CURTIS, District Judge:

This is an appeal by the plaintiff from a summary judgment in favor of the defendants. *Walker v. University Books, Inc., et al.*, 193 U.S.P.Q. 596 (N.D.Cal.1977). Appellant originally brought this action for copy-

---

* Honorable Jesse W. Curtis, United States District Judge, Central District of California, sitting by designation.

right infringement, unfair competition resulting from misappropriation of trade secrets, and fraud. The latter count has been dismissed and is not in issue on appeal. For reasons hereinafter appearing, we affirm in part, reverse in part, and remand.

Walker copyrighted and published a set of 72 cards which she entitled "I Ching Cards" and which are designed to aid in the instruction of an ancient Chinese method of divination or fortune-telling. Appellant concedes that her cards were an adaptation of the James Legge translation of the I Ching, a work in the public domain. The validity of her original copyright of the format is not in issue on appeal. In the fall of 1971, the appellant determined to enlist the aid of a professional New York publishing firm in the marketing of her cards and, pursuant to this goal, met and conferred with Defendant-Appellee Sol Weinreich, president of Appellee Noble Offset Printers, Inc. Weinreich introduced Appellant to Felix Morrow who had some expertise in the area of publishing with which the Appellant was concerned. Appellant attempted to interest both men in a joint publishing venture regarding her cards and in this connection, revealed to them, allegedly in confidence, her ideas for improving the format and appearance of the I Ching cards. These proposed embellishments consisted of the use of a higher quality stock, brighter colors, rounded corners, red borders, larger hexagrams on the face of each card, and a higher quality container in which the cards would be sold.

Initially, Morrow appeared to be willing to participate in the venture; however, this interest was apparently short-lived and no agreement was forthcoming. Later in the fall of 1971, Appellant received a letter from Appellee Robert Salomon, then vice-president of Appellee Lyle Stuart, Inc. and president of Appellee University Books, requesting a sample deck of her cards pursuant to their possible use by Lyle Stuart's Mystic Arts Books Society. Appellant provided the requested set to Lyle Stuart, Inc. and also sent one to Sol Weinreich.

In December of 1971, Appellant became aware of a promotional flyer then being circulated to booksellers by Lyle Stuart, Inc. which advertised its upcoming publication of "I Ching Cards" based on the original James Legge translation. Indicated was a prospective distribution date of sometime in February, 1972 and potential purchasers were urged to "order now."

In February of 1972, Appellant's attorney wrote to Lyle Stuart protesting the publication at issue on the grounds that it would constitute an infringement of Walker's copyright. In a letter dated March 8, 1972, Stuart's counsel Jack Albert, replied to this correspondence by mail, denying the charge of infringement and enclosing what he described as "photocopies of the blueprints for certain cards being prepared for production by my client." The record indicates that the enclosed facsimiles were of blueprints of cards prepared by Noble Offset Printers from original "camera-ready mechanicals" supplied by University Books. The blueprints themselves can be characterized as proofs of the art work which would appear on the finished cards. [Brief for Appellee at 5.] The record indicates that Appellees University Books and Lyle Stuart produced a complete set of I Ching cards and began distributing them commercially around May 25, 1972.

Contemporaneous with her attempts to dissuade the Appellees from publishing their cards, the Appellant sought a publisher for her own version of the I Ching. Pursuant to this effort, appellant entered into an agreement with U.S. Games Systems, Inc. on March 2, 1972, whereby she assigned her copyright to the cards to U.S. Games which had agreed to publish same. In return Walker received the right to receive royalties, a portion of any revenue received by U.S. Games in the event they were to license the copyright to third parties, and the right of reversion if the agreement were terminated. In addition, appellant retained the right of renewal of the copyright and the right to sue for past infringements, as well as the right to assign her residual interest.

U.S. Games began manufacturing the cards pursuant to the assignment, utilizing the services of a Swiss printer. On June 2, 1972, U.S. Games instructed the printer to delete the statutory copyright notice from the cards in order that more than 1,500 copies could be imported into the United States. Importation of more than that number of cards would be prohibited by the Copyright Act were the notice not removed. 17 U.S.C. §§ 16, 107 (1909 Act).

Walker, concerned that the actions of U.S. Games described above threatened her copyright, negotiated a second agreement with that company in the fall of 1973 which terminated the March 2, 1972 assignment and granted to U.S. Games a license to publish and distribute the cards in the United States provided the statutory notice was affixed. However, the record indicates and the Appellant does not dispute that several thousand decks of the I Ching cards were marketed by U.S. Games in the United States during the period of the assignment without the statutory copyright notice affixed.

The Appellant's contentions before the district court, briefly stated, were as follows. Appellees published their I Ching cards in violation of her copyright, copying her work and utilizing the improvements which were the product of her creative efforts and disclosed to them in confidence as trade secrets. Appellees assert that, although they admittedly had access to Appellant's version of the I Ching, they, like her, based their presentation on the original James Legge translation which could be freely copied since it was in the public domain. Further, Appellees contend that their cards were developed without incorporation of the Appellant's suggested improvements and that the alterations which were revealed to them are standard practices and common knowledge in the area of the publishing industry at issue and thus can not form the basis for a claim of misappropriation of trade secrets.

In granting the motion of the defendants for summary judgment on the copyright question, the district court analyzed the is-

sue in terms of the periods prior and subsequent to the assignment of Appellant's copyright to U.S. Games on March 2, 1972. Due to the significance of the assignment and the date thereof, we choose to follow this same approach.

 In addressing Appellant's claim for infringement occurring after the March 2, 1972 agreement was consummated with U.S. Games, the court initially found that this agreement constituted, on its face, a valid assignment of the copyright in issue because the agreement transferred the totality of rights conferred by the copyright to the assignee. With this finding we are in agreement and the Appellant has not attempted to refute it on appeal. This finding is crucial to Appellant's claim since, in order for a plaintiff to prevail on an action for infringement, two elements must be established: Ownership of a valid copyright and copying of the protected work by the defendant. 17 U.S.C. § 101 (1909 Act); *Reyher v. Children's Television Workshop*, 533 F.2d 87 (2d Cir. 1976); *3 Nimmer on Copyright*, § 13.01 (1978). Under the 1909 Act, here applicable, an assignor of a copyright has no standing to sue for infringements which occur subsequent to the effective date of the assignment. 3 *Nimmer* § 10.01. Therefore, Appellant lacks standing to assert claims for infringement during the period of the assignment of her copyright to U.S. Games.

Appellant has argued on appeal that she retained a sufficient beneficial interest in the protected work to support her right to bring suit notwithstanding the assignment. However, the rule under the 1909 Act which here controls requires that the Appellant can only bring an action based on this theory of retained interest if the assignee, U.S. Games, has first refused to bring such action and then only provided that the assignee is joined in the suit. *See e.g., Manning v. Miller Music Corp.*, 174 F.Supp. 192, 194 (S.D.N.Y.1959); 3 *Nimmer* § 10.01(c)(1). The record indicates that U.S. Games was never requested by Walker to bring the instant suit nor was that company ever joined as a party. We therefore affirm the

ruling of the district court which denied standing to the Appellant to bring suit for infringement during the period of the assignment to U.S. Games.

Appellant contends that she has standing to bring her claim for infringement subsequent to the period of the assignment pursuant to the second agreement with U.S. Games, entered into sometime in the fall of 1973, whereby the March 2, 1972 assignment was terminated and she once again became the copyright proprietor. However, the record reveals that during the assignment period, U.S. Games published copies of the protected work in the United States without the essential copyright notice having been affixed thereon. Although the record indicates that such action may have been undertaken without the express consent of the Appellant, the effect of this publication was the forfeiture of the copyright, a result which occurs by operation of the law; as the assignee, U.S. Games possessed the requisite interest in the copyright to trigger the forfeiture. 17 U.S.C. § 10 (1909 Act); *National Comics Publications v. Fawcett Publications*, 191 F.2d 594 (2d Cir. 1951); 2 *Nimmer* § 7.14; 3 *Nimmer* § 13.06. We therefore affirm the holding of the district court that the Appellant lacks standing to assert a claim for copyright infringement which may have occurred subsequent to the termination of the assignment of her copyright to U.S. Games.

Thus there remains in question on appeal the copyright infringement which allegedly occurred prior to the March 2, 1972 assignment of the copyright to U.S. Games. The district court found that no cause for infringement would lie prior to this date because the Appellant had presented no evidence supporting her contention that the Appellees had "copied" her work before March 2, 1972. Specifically, the court found that there was no indication that any completed decks of I Ching cards were produced and sold by the Appellees prior to May 25, 1972. The record shows that on March 8, 1972, in an exchange of correspondence with Appellees' attorney, Appellant's counsel received copies of certain blueprints of cards produced by Noble Offset Printers at the behest of Lyle Stuart, Inc. Although the court recognized that whether or not such blueprints existed prior to March 2, 1972 was an unresolved question of fact, it ruled that as a matter of law the blueprints could not constitute an infringing copy and accordingly granted summary judgment in favor of the Appellees. The court reached this result by characterizing the blueprints as mere plans or preparations undertaken by the Appellees pursuant to the production of their I Ching cards. As such, the court reasoned they could not constitute a tangible reproduction of Appellant's work which was a complete set of cards.

> "The affidavit of counsel relates only to the existence of certain blueprints or proofs used in the creation of defendants' cards. Plaintiff has cited no authority, nor is the court aware of any, which holds that the existence of plans, preparations or blueprints of a final product constitutes copying which would give rise to liability for damages. A copy is a *tangible reproduction* of a work not a mere blueprint preliminary to production. *See* 1 *Nimmer, supra*, at §§ 101.2, 101.3." *Walker, supra*, 193 U.S.P.Q. at 602.

With this analysis and the legal conclusion flowing therefrom, we disagree. Although the 1909 Act contains no definition of the term of art "copy" and there exists no precedent which precisely supports the assertion of the Appellant, the 1909 Act does specifically enumerate those exclusive rights granted to the copyright holder and our inquiry begins at this point. The Act grants to the copyright holder the exclusive rights to "print, reprint, publish, copy and vend the copyrighted work." 17 U.S.C. § 1(a) (1909 Act).

Given that the Appellant possessed, prior to March 2, 1972, the exclusive right to "print" and "copy" her work, the question thus before us is whether the blueprints can constitute a copy for purposes of the Act. A copy must of necessity consist of some tangible material object upon which the work is "fixed". *See C. M. Paul v. Logan*, 355 F.Supp. 189 (N.D.Tex.1973); 2 *Nimmer*

864

§ 8.02(b). The notion of "fixation" requires that the material object must, in some manner, take on the physical aspects of the protected work such that the "copy" of that work may be perceived by an observer. Clearly, a blueprint, which consists of visible printed markings on paper, is sufficiently tangible and permanent in nature to permit "fixation" under the above definition, particularly in a case such as this where the protected work, like the blueprints themselves, is perceived by the observer via a two dimensional printed presentation.

■ The district court viewed the making of the blueprints as merely a preliminary step or process directed towards the manufacture of Appellees' finished product, their set of I Ching cards. Thus the blueprints themselves could not, in the court's analysis, amount to a "tangible reproduction" of Appellant's work, which was also a completed set of cards. However, the fact that an allegedly infringing copy of a protected work may itself be only an inchoate representation of some final product to be marketed commercially does not in itself negate the possibility of infringement. The question is not whether the Appellees utilized the blueprints as merely a step in the manufacture of their cards but whether they unauthorizedly utilized Appellant's work in the manufacture of their blueprints. Clearly, had the blueprints been reproduced *directly* from Walker's version of the I Ching, with her cards serving as the originals, she would have a sound cause of action for infringement. That an infringing copy may be produced in a medium different than that of the protected work is not, in itself a bar to recovery, nor does the fact that the blueprints themselves were never sold for profit eliminate the possibility of an award of statutory damages for infringement under the Act. 17 U.S.C. § 101; *Tennessee Fabricating Co. v. Moul-*

*trie Mfg. Co.*, 421 F.2d 279 (5th Cir. 1970); *Wihtol v. Crow*, 309 F.2d 777 (8th Cir. 1962); 2 *Nimmer* § 8.02(c).

■ Appellees have argued on appeal that the district court's finding should be affirmed because Appellant has failed to produce direct evidence of copying and thus Appellees' assertions of independent creation stands uncontroverted. We note that Appellant, in order to establish a prima facie case, must demonstrate only that the Appellees had access to her work (here conceded) and that there exists substantial similarity between their work and her own. *Herbert Rosenthal Jewelry Corp. v. Kalpakian*, 446 F.2d 738 (9th Cir. 1971). As to proof of actual copying, this is often attained by a demonstration of the above elements in a situation where the similarity between the two works is such that no explanation other than copying is reasonably plausible. 3 *Nimmer* 13.01(b). However, we need not reach the issue of substantial similarity, a question most appropriately resolved by the trier of fact, because the court below based its ruling solely on the premise that the blueprints, could not, as a matter of law, constitute an unlawful copy in the context of the instant case. Our holding is thus limited in scope and we reverse the district court only as to this proposition upon which the grant of summary judgment as to infringement prior to March 2, 1972 was based.

## TRADE SECRETS

The court granted summary judgment to the Appellees on the issue of misappropriation of trade secrets on the basis that the improvements which the Appellant revealed, allegedly in confidence to the Appellees, could not constitute protectible "trade secrets" as that term is defined in Restatement of Torts § 757,[1] admitted by both parties to be controlling here.

1. § 757. LIABILITY FOR DISCLOSURE OR USE OF ANOTHER'S TRADE SECRET—GENERAL PRINCIPLE.
 One who discloses or uses another's trade secret, without a privilege to do so, is liable to the other if

 (a) he discovered the secret by improper means, or

 (b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him, or

■ The improvements which were communicated to the Appellees consisted of the following: use of a higher quality stock for the cards, brighter colors, rounded corners, wide red borders, larger hexagrams on the face of the cards and a higher quality box in which the cards would be packaged for sale. The Appellant asserts on appeal that the grant of summary judgment against her precluded her efforts to demonstrate at trial the validity of her contention that the embellishments listed above represented "trade secrets" using the factors applicable under Restatement of Torts, § 757, Comment (b).[2]

The district court refused to view the improvements listed above as protectible in that they are "both vague and obvious, and as a matter of law [do] not constitute 'information . . . which gives [a party] an opportunity to obtain an advantage over competitors . . .' Restatement of

Torts, § 757, Comment (b)." *Walker, supra,* 193 U.S.P.Q. at 605.

With this finding we agree and therefore affirm the lower court on the issue of unfair competition.

In light of the above findings, the request of the Appellees for an award of costs pursuant to Rule 38 of the F.R.App.P. is hereby denied.

Affirmed in part, reversed in part, and remanded.

(c) he learned the secret from a third person with notice of the facts that it was a secret and that the third person discovered it by improper means or that the third person's disclosure of it was otherwise a breach of his duty to the other, or

(d) he learned the secret with notice of the facts that it was a secret and that its disclosure was made to him by mistake.

2. A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers. It differs from other secret information in a business (see § 759) in that it is not simply information as to single or ephemeral events in the conduct of the business, as, for example, the amount or other terms of a secret bid for a contract or the salary of certain employees, or the security investments made or contemplated, or the date fixed for the announcement of a new policy or for bringing out a new model or the like. A trade secret is a process of device for continuous use in the operation of the business. Generally it relates to the production of goods, as, for example, a machine or formula for the production of an article. It may, however, relate to the sale of goods or to other operations in the business, such as a code for determining discounts, rebates or other concessions in a price list or catalogue, or a list of specialized customers, or a method of bookkeeping or other office management.

*Secrecy.* The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. Matters which are completely disclosed by the goods which one markets cannot be his secret. Substantially, a trade secret is known only in the particular business in which it is used. It is not requisite that only the proprietor of the business know it. He may, without losing his protection, communicate it to employees involved in its use. He may likewise communicate it to others pledged to secrecy. Others may also know of it independently, as, for example, when they have discovered the process or formula by independent invention and are keeping it secret. Nevertheless, a substantial element of secrecy must exist, so that, except by the use of improper means, there would be difficulty in acquiring the information. An exact definition of a trade secret is not possible. Some factors to be considered in determining whether given information is one's trade secret are: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.