SEGA ENTERPRISES LTD., a Japanese Corporation, Plaintiff,

v.

ACCOLADE, INC., a California Corporation, Defendant.

ACCOLADE, INC., a California Corporation, Counterclaimant,

v.

SEGA ENTERPRISES LTD., a Japanese Corporation, and Sega of America, Inc., Counterdefendants.

No. C–91–3871 BAC.

United States District Court, N.D. California.

April 3, 1992.

Joel Linzner, Scott D. Baker, Crosby Heafey Roach & May, Oakland, Cal., James Alan Cook, Cook & LeFevre, Palo Alto, Cal., Riley R. Russell, Redwood City, Cal., for plaintiff.

William S. Coats, Heather D. Rafter, David M. Shannon, Patrice C. Scatena, Gibson Dunn & Crutcher, San Jose, Cal., for defendant.

## ORDER GRANTING PRELIMINARY INJUNCTION

CAULFIELD, District Judge.

This matter comes before the court on plaintiff's motion for preliminary injunction and defendant/counterclaimant's cross-motion for preliminary injunction. Oral argument was heard on March 13, 1992. After careful consideration of the parties' oral and written arguments, and documents and declarations filed in support thereof, the court hereby GRANTS plaintiff's motion for preliminary injunction and DENIES defendant/counterclaimant's motion for preliminary injunction.

## BACKGROUND

Sega Enterprises, Ltd. ("SEL") and its wholly owned subsidiary, Sega of America ("SOA"), develop and market video entertainment systems, including the Genesis console and video game cartridges. Accolade, Inc. ("Accolade"), founded in 1984, manufactures computer entertainment software, including game cartridges compatible with the Genesis console.

A computer program consists of a series of instructions that cause a computer to perform certain operations. Computer programs are generally written in one of several special languages (e.g. BASIC, FORTRAN), which can be understood by a trained programmer. The "source code" is translated into a computer readable language called "object code," a series of 1's and 0's, which is difficult for humans to decipher. The object code is then imprinted onto a silicon chip.

Reverse engineering, as the name implies, involves going backwards from a finished product and determining how the pro-

gram works. One method of reverse engineering involves the use of disassemblers, which allow someone to convert object code into a form more easily read by humans. In 1989, Accolade "reverse engineered" the video display microprocessor in the Genesis console by disassembling the code in SEL's game cartridges so that it could develop and market Genesis-compatible video games. In June 1990, Accolade announced that it was releasing a new game for the Genesis console, "Ishido," and began shipping in December 1990.

At about the same time, SEL developed a system to protect its trademark rights in response to counterfeiters in the United States and abroad. In March 1990, SEL licensed a patented process for the trademark security system ("TMSS") by which the console's operating system "reads" a game program for specific computer code. If the game program contains the TMSS initialization code, it prompts a visual display on the monitor which reads "PRODUCED BY OR UNDER LICENSE FROM SEGA ENTERPRISES LTD" (the "Sega Message").

Although the new Genesis consoles with the TMSS ("Genesis III") were not released in the United States until September 1991, Accolade learned of the Genesis III in January of 1991 when it was displayed at the Consumer Electronics Show ("C.E.S."). It was also demonstrated at the C.E.S. that the Ishido game did not operate on the Genesis III. In response, Accolade disassembled and copied more SEL programs looking for the common code that could be part of the TMSS and which it thought might be functional. Accolade then copied that code and included it in its video game programs, which now prompt the Sega Message when played on the Genesis III console. Accolade admits that the Sega Message as displayed on its games is a false message since the games displaying the message are not produced under license from SEL.

SEL filed this suit against Accolade on October 31, 1991 alleging copyright infringement, trademark infringement, and unfair competition. Accolade filed a counterclaim against SEL and SOA alleging false designation of origin and unfair competition. Accolade's claims are centered on allegations that SEL and SOA falsely attributed the source of Accolade's products to themselves, thereby injuring Accolade's reputation as an independent producer of video game products.

*PRELIMINARY INJUNCTION STANDARD*

SEL has moved the court for an order enjoining Accolade from:

1. Disassembling, translating, converting or adapting the copyrighted object code in SEL's game programs in any manner whatsoever;

2. Using, modifying, enhancing or embellishing SEL's disassembled code in any manner whatsoever;

3. Developing, manufacturing, shipping, distributing or selling any Genesis-compatible video game programs that were derived from, based upon or otherwise created—in whole or in part—by means which included the disassembly, translation, transformation or enhancement of the copyrighted object code in SEL's game programs;

4. Manufacturing, shipping, distributing or selling any Genesis-compatible video game program which prompts the message "PRODUCED BY OR UNDER LICENCE FOR SEGA ENTERPRISES LTD." when inserted in a Genesis console.

Accolade in turn moves that the court enjoin SEL and SOA from manufacturing or distributing the Genesis III console.

The Ninth Circuit has held that in order to obtain a preliminary injunction, the movant must demonstrate "either a likelihood of success on the merits and the possibility of irreparable injury, or that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor." *Johnson Controls, Inc. v. Phoenix Control Systems, Inc.*, 886 F.2d 1173, 1174 (9th Cir.1989), and cases cited.

SEL'S COPYRIGHT CLAIMS

Section 501(a) of the Copyright Act defines copyright infringement as follows: "Anyone who violates any of the exclusive

rights of the copyright owner as provided by sections 106 throughout 118 ... is an infringer of the copyright." Such rights include the exclusive right to 1) reproduce and to authorize others to reproduce the copyrighted work, and 2) to prepare and to authorize others to prepare derivative works based upon the copyrighted work. 17 U.S.C. § 106. "Derivative works" are defined to include translations and any form in which a work may be recast, transformed or adapted. 17 U.S.C. § 101.

SEL claims that Accolade has infringed its copyrights, because its Genesis-compatible games are based upon illegal reproductions and adaptations of SEL's copyrighted works. The alleged illegal copying was accomplished as follows according to deposition testimony of Accolade's engineers: 1) the object code in SEL's copyrighted game programs was disassembled and translated into assembly language; 2) Accolade made intermediate copies of this derivative material and "embellished" it; and 3) Accolade wrote game programs based upon the allegedly illegal reproduction.

■ Accolade attempts to frame the issue in terms of the permissibility of reverse engineering. SEL does not contend that reverse engineering is itself improper. Rather, the issue is whether the means employed infringed SEL's copyright. If the process of reverse engineering software entails the duplication of the copyrighted work and the recasting or transformation of the object code into a form more intelligible to humans, it may infringe upon the copyright owner's exclusive rights. *See SAS Institute, Inc. v. S & H Computer Systems, Inc.*, 605 F.Supp. 816 (M.D.Tenn.1985) (unauthorized, exact copies of the SAS source code infringed SAS's copyright), *cited with approval in Atari Games Corp. v. Nintendo of America, Inc.*, 18 U.S.P.Q.2d 1935, 1991 WL 57304

(N.D.Cal.1991); [1] *see also Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1253 (3rd Cir.1983), *cert. dismissed*, 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984); *Hubco Data Products Corp. v. Management Assistance, Inc.*, 219 U.S.P.Q. 450, 1983 WL 1130 (D.Idaho 1983) (MAI had a reasonable probability of showing that both written printout of object code and copying of object code inside the computer constituted copyright infringement).

■ The court rejects Accolade's argument that SEL must establish substantial similarity between Accolades' final product and plaintiff's and that intermediate copies do not provide a basis for copyright infringement. The language of the Copyright Act itself indicates no such limitation. As explained in *Walt Disney Productions v. Filmation Associates*, 628 F.Supp. 871, 876 (C.D.Cal.1986), copies are defined as "material objects ... in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 101. "A work is 'fixed' in a tangible medium of expression when its embodiment in a copy ... is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." *Id.* "[W]here a work is prepared over a period of time, the portion of it that has been fixed at any particular time constitutes the work as of that time, and where the work has been prepared in different versions, each version constitutes a separate work." *Id.* "To constitute an actionable copy, therefore, an expression need only be a material object permanently case [sic] in some intelligible form." *Walt Disney Productions*, 628 F.Supp. at 876.

---

1. Contrary to Accolade's argument, *SAS* was not "limited to a finding at trial that the alleged infringer's final program was substantially similar to the copyrighted program." *Atari*, 18 U.S.P.Q. at 1939. Nor can Accolade distinguish *SAS* on the grounds that S & H was also guilty of breach of contract. As Judge Smith noted in *Atari*, "*SAS* explicitly addresses the intermediate copying argument.... [and] at trial, the court adopted and incorporated unconditionally the finding of infringing intermediate copying." 18 U.S.P.Q.2d at 1939; *see also, SAS Institute*, 605 F.Supp. at 828–29 and *S & H Computer Systems, Inc. v. SAS Institute, Inc.*, 568 F.Supp. 416, 420, 422 (M.D.Tenn.1983).

Courts in this circuit that have addressed the issue have found intermediate copying to be actionable. In *Walt Disney*, which involved the production of an animated motion picture entitled "The New Adventures of Pinocchio," Filmation contended that a copyright action could not be brought until the motion picture was completed. Filmation argued that the materials created at that point were "only transitory steps en route to a fixed product, and . . . that there exists no article that could be said to infringe any of Disney's copyrights." The court disagreed and observed,

> Because the right of reproduction affords a copyright owner protection against an infringer even if he does not also infringe the § 106(3) right of distribution, the fact that the articles may never be published or, indeed, may be prepared only for the use of [defendants], does not obviate the possibility of infringement . . . the Act prohibits the creation of copies, even if the creator considers those copies mere interim steps toward some final goal.

*Walt Disney Productions*, 628 F.Supp. at 876 (citations omitted); *see also Johnson Controls, Inc.*, 886 F.2d at 1177 (holding that it was unnecessary for a district court to review the final version of defendant's software once it was completed.).

The court in *Walt Disney* relied heavily upon *Walker v. University Books, Inc.*, 602 F.2d 859 (9th Cir.1979). In *Walker* the plaintiff brought an action for copyright infringement alleging that blueprints prepared by defendants in the manufacture of "I Ching" fortune-telling cards constituted unauthorized copies. The district court granted summary judgment against plaintiff on the grounds that the blueprints themselves could not amount to a "tangible reproduction" because they were merely a preliminary step or process directed toward the manufacture of the finished product. The Ninth Circuit reversed and stated,

the fact that an allegedly infringing copy of a protected work may itself be only an inchoate representation of some final product to be marketed commercially does not in itself negate the possibility of infringement. . . . That an infringing copy may be produced in a medium different than that of the protected work is not, in itself a bar to recovery, nor does the fact that the blueprints themselves were never sold for profit eliminate the possibility of an award of statutory damages for infringement under the [Copyright] Act.

*Id.* at 864.[2]

The cases cited by Accolade in support of its opposition are not compelling. Accolade cites *NEC Corp. v. Intel Corp.*, 10 U.S.P.Q.2d 1177, 1989 WL 67434 (N.D.Cal. 1989) for the proposition that disassembly of code is permissible under copyright law. The court in NEC did not address the issue of intermediate copying, however, and the case is inapplicable here.

The footnote cited by Accolade from *E.F. Johnson Co. v. Uniden Corp. of America*, 623 F.Supp. 1485, 1501 n. 17 (D.C.Minn. 1985) is no more persuasive. Although the court stated in dicta that "dumping" and analyzing of competitors' codes does not, in itself, establish pirating, the court found infringement in the final version of defendant's work. Intermediate copying was not an issue before the court, and dicta in this regard is not convincing.

### A. Fair Use Doctrine

■ The criteria to be considered in determining whether a particular use is fair use include:

1. the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
2. the nature of the copyrighted work;

---

**2.** The Ninth Circuit's decision in *See v. Durang,* 711 F.2d 141 (9th Cir.1983) does not require a different result. Although the court stated that "[c]opying deleted or so disguised as to be unrecognizable is not copying," the issue of intermediate copying was not before the court, and such dicta is not binding. *See Sakamoto v. Duty*

*Free Shoppers, Ltd.,* 764 F.2d 1285, 1287 (9th Cir.1985), *cert. denied,* 475 U.S. 1081, 106 S.Ct. 1457, 89 L.Ed.2d 715 (1986) ("assumption on non-litigated issues are not precedential holdings binding future decisions.") Moreover, later Ninth Circuit authority indicates a different view. *See Johnson Controls, Inc.* at 1177.

3. the amount and substantially of the portion used in relation to the copyrighted work as a whole; and

4. the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

The copying at issue here was undertaken by Accolade for financial gain and was aimed at the creation of a competitive product which will adversely impact the value of the copyrighted work. Such commercial use is presumptively not "fair use". *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 451, 104 S.Ct. 774, 793, 78 L.Ed.2d 574 (1984). "'Fair use, when properly applied, is limited to copying by others which does not materially impair the marketability of the work which is copied.'" *Harper & Row Publishers v. Nation Enterprises*, 471 U.S. 539, 566–67, 105 S.Ct. 2218, 2234, 85 L.Ed.2d 588 (1985) (quoting 1 M. Nimmer, Copyright § 1.10[D], p. 1–87 (1984)). Accolade's game cartridges compete directly with those of SEL, which has likely lost sales as a result of Accolade's copying. In addition, since SEL's disassembled code is an "unpublished work", it is subject to a narrower scope of fair use. *Harper & Row*, 471 U.S. at 554, 564, 105 S.Ct. at 2232.

The court rejects the argument that Accolade was merely reading the game cartridges and that it could read the program only by transforming the object code into human readable form. This argument implies that "fair use" should be allowed in order to gain access. As noted by a commentator, such argument

> misconceives the role of both Section 102(b) and Section 107 of the Copyright Act and does violence to the term "access."

> The public's need for access to the copyrighted work is fully satisfied by the copyright owner's marketing of the original. A competitor who reverse-engineers a copyrighted computer program is not at all interested in increasing that access; to the contrary, his only purpose is to get the public to purchase his work rather than the original thereby eliminating the market for the original. Nor is the commercial nature of the reverse engineering changed by the "need" to reverse-engineer the object code of the original in order to discover the (unpublished) source code and thereby the ideas of the original. The emphasis on appropriating the idea mistakes the role of Section 102(b), which denies protection ab initio to ideas but which is not designed to form an independent basis for the appropriation of protectable expression under the cloak of Section 107.

Patry, W., *The Fair Use Privilege In Copyright Law* 401 (1985).

■ Legislative history also indicates that a fair use exception for intermediate copying of software was not intended by Congress. The Copyright Act does not provide an exception for intermediate copying of software for the purpose of "reverse engineering." If Congress intended such an exception, it would have provided for it as it did in the Semiconductor Chip Protection Act, 17 U.S.C. §§ 901 *et seq.* ("Semiconductor Act"). Unlike the Copyright Act, the Semiconductor Act specifically provides that one may make intermediate copies of a protected mask work (i.e. a silicon chip) in the course of reverse engineering.[3] Congress chose not to amend the Copyright Act and make reverse engineering a form of "fair use" under § 107, but instead created a separate right to reverse engineer mask works under the Semiconductor Act. Congress was concerned that "to call reverse engineering [of semiconductor chips] a form of fair use under Section 107 of the Copyright Act might encourage a more ex-

---

**3.** Section 906 of the Semiconductor Act provides that:

it is not an infringement of the exclusive rights of the owner of a mask work for (1) a person to reproduce the mask work solely for the purpose of teaching, analyzing, or evaluating the concepts or techniques embodied in the mask work or the circuitry, logic flow, or organization of the components used in the mask work; or (2) a person who performs the analysis or evaluation described in paragraph (1) to incorporate the results of such conduct in an original mask work which is made to be distributed.

pansive interpretation of this limitation on exclusive rights in the case of literary works," [4] 130 Cong.Rec.S. 5836 (May 16, 1984) (Sen. Mathias); *see also* Patry, W., *The Fair Use Privilege in Copyright Law* 340–46 (1985).

Accolade could have "peeled" the microchips as set forth in § 906, Miller Depo. 33:12–34; 113:7–22, or programmed in a "clean room," but instead chose to disassemble, reproduce and enhance SEL's software. *Compare, Atari Games Corp.*, 18 U.S.P.Q.2d at 1935 (If Atari had proceeded with its analysis of "peeled" Nintendo chips as allowed by § 906, and not utilized the copy wrongfully obtained from the Copyright Office, it would not have infringed Nintendo's copyright). Such alternative methods are more time-consuming and expensive, but Accolade does not suggest they are impossible. *C.f. Allen–Myland, Inc. v. International Business Machines Corp.*, 746 F.Supp. 520, 533 (E.D.Pa.1990) ("Whether it would be economically feasible for AMI to write its own program ... without copying any of IBM's 3090 microcode is not relevant....").

### B. *Section 117*

■ Section 117 allows an owner of a program to make a copy where the copy is an "essential step in the utilization of the computer program in conjunction with a machine and ... it is used in no other manner." 17 U.S.C. § 117(1). This narrow exception to the copyright act allows an owner of a program to load it into his computer for use, which involves making a copy in the machine memory. Section 117 also permits archival copies to be made by an owner. Accolade did not copy SEL's copyrighted game programs for the exclusive purpose of using those programs; nor did Accolade make copies for archival purposes. Rather, Accolade made copies for the purpose of manufacturing compatible games.

Accolade nonetheless argues its intermediate copies fall under section 117 and cites *Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255 (5th Cir.1988). However, *Vault* "held only that § 117(1) permits the loading of a program into a computer's memory even if the copy was then analyzed in memory for a purpose unintended by the copyright owner." *Allen–Myland*, 746 F.Supp. at 536. *Vault* did not involve photocopying of the copyright owner's object code, dissembling the object code into derivative assembly code and making photocopies thereof, or enhancement of the assembly code. Thus, the limited holding in *Vault* does not aid Accolade.

### C. *Copyright Misuse—Unclean Hands*

■ The defense of copyright misuse is a form of unclean hands, which prevents the copyright owner from obtaining relief "when the infringement occurred by his dereliction of duty." *Supermarket of Homes, Inc. v. San Fernando Valley Board of Realtors*, 786 F.2d 1400, 1408 (9th Cir.1986). Accolade's copyright misuse defense is based upon antitrust tying allegations, which the court ordered stricken from Accolade's counterclaim. No antitrust violation is alleged, nor is there proof of fraud or other clear violation of a legal duty. *See Bellsouth Advertising & Publishing Corp. v. Donnelley Information Publishing, Inc.*, 933 F.2d 952, 961 (11th Cir.1991); *K–91, Inc. v. Gershwin Publishing Corp.*, 372 F.2d 1, 2 (9th Cir.1967), *cert. denied*, 389 U.S. 1045, 88 S.Ct. 761, 19 L.Ed.2d 838 (1968). Thus, Accolade has failed to establish a copyright misuse defense.

■ Accolade and the amicus curiae brief submitted by American Committee for Interoperable Systems ("ACIS") set forth policy reasons why the intermediate copying of computer software should be allowed in order to develop programs compatible with video game hardware. It is argued that in the interim, copying of code is necessary as a practical matter to achieve interoperability, which is critical in the computer industry. Equally compelling

---

**4.** "Literary works" under the Copyright Act include computer programs. *See Whelan Assoc., Inc. v. Jaslow Dental Laboratory, Inc.*, 797 F.2d 1222, 1234 (3rd Cir.1986), *cert. denied*, 479 U.S. 1031, 107 S.Ct. 877, 93 L.Ed.2d 831 (1987).

policy reasons have been advanced in SEL's favor. The grant of a copyright is intended to motivate creative activity by the provision of a special reward, and eventually allows the public total access to the products of their genius after the limited period of exclusive control has expired. . . . Without the economic incentive to create which copyright protection provides, this incentive and the advantages it creates for society may well be lost.

*West Pub. Co. v. Mead Data Central, Inc.,* 616 F.Supp. 1571, 1582 (D.Minn.1985), *aff'd,* 799 F.2d 1219 (8th Cir.1986), *cert. denied,* 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987) (citing *Harper & Row,* 471 U.S. at 539, 105 S.Ct. at 2219). Such policies must be balanced by Congress, not the courts, which must "apply[] the copyright statute as it now reads." *Sony Corp. v. Universal City Studios, Inc.,* 464 U.S. 417, 456, 104 S.Ct. 774, 796, 78 L.Ed.2d 574 (1984).

For the forgoing reasons, the court concludes that SEL is likely to succeed on the merits of its claim of copyright infringement.

## SEL'S TRADEMARK INFRINGEMENT CLAIM

■ A federal trademark infringement claim may be brought against any person who, without consent of the holder of the registered trademark,

use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive. . . .

15 U.S.C. § 1114(1)(a). Both Accolade and SEL admit that the false Sega Message which is prompted when Accolade's games are played on the Genesis III console has created the strong likelihood of confusion

by consumers. Accolade copied the computer code for S–E–G–A from SEL's game cartridges and inserted that S–E–G–A code into its game programs, thereby prompting the false Sega Message, including Sega's name, to appear on the television screen. Accolade boldly inserted SEL's code into its games before SEL released the Genesis III into the marketplace, and thus without fully realizing the consequences. Accolade took that risk, and cannot now shift the responsibility to SEL and SOA.

■ Accolade argues that it thought the code might be "functional." The functionality doctrine allows the use of a trademark by another when there is no other alternative. *See Clamp v. Enco Mfg. Co.,* 870 F.2d 512, 516 (9th Cir.1989), *cert. denied,* 493 U.S. 872, 110 S.Ct. 202, 107 L.Ed.2d 155 (1989). However, the evidence indicates otherwise. Accolade could have created a game cartridge which either did not have the TMSS code, or engineered the game program in such a way that the false Sega Message would not be displayed on the screen, both at minimal additional expense. Nagashima Declaration ¶¶ 4–5.

Even if it were not possible to engineer around the TMSS and prevent the false Sega Message, Accolade could have taken other steps to avoid confusion. The functionality defense is not available unless Accolade used the "most effective method reasonably available for eliminating the likelihood of confusion consistent with the functional use of the mark". *See Plasticolor Molded Products v. Ford Motor Co.,* 713 F.Supp. 1329, 1339 (1989), *vacated,* 767 F.Supp. 1036 (C.D.Cal.1991).[5] For example, Accolade could have followed the false Sega Message with a full disclaimer or placed a disclaimer on the game cartridges themselves.[6] Thus, it appears unlikely that Accolade can prevail on its functionality defense.

---

5. Even though the *Plasticolor* opinion has been vacated due to a settlement by the parties, Judge Kosinzki's discussion is still useful as "enlightening authoritative commentary." *Compare Weisberg v. Webster,* 749 F.2d 864, 870 (D.C.Cir. 1984).

6. Although the Accolade games do contain a disclaimer on their cardboard box, such boxes may be thrown away by the consumer.

For the foregoing reasons, SEL has demonstrated a likelihood of success on the merits of its trademark claim.

## IRREPARABLE HARM

In order to prevail on its motion for preliminary injunction, SEL must also demonstrate the possibility of irreparable harm. A showing of a *prima facie* case of copyright infringement or a showing of reasonable likelihood of success on the merits raises a presumption of irreparable harm. *Johnson Controls*, 886 F.2d at 1174; *Atari Games Corp.*, 18 U.S.P.Q.2d at 1940. Moreover, "The jeopardy to [the copyright holder's] investment and competitive position caused by [the defendant's] wholesale copying of many of its key operating programs would satisfy the requirement of irreparable harm...." *Apple Computer, Inc.*, 714 F.2d at 1254, *quoted in Atari*, 18 U.S.P.Q.2d at 1940.

Similarly, in trademark cases irreparable injury follows trademark infringement. As stated by Chief Judge Henderson:

> The fact that plaintiff has had the symbol of its reputation placed in the hands of another is irreparable injury. 'The injury is to plaintiff's interest in having exclusive control over the symbol of its own reputation.... The irreparable harm is the damage which will be done to plaintiff's mark itself.'

*Visa International Service Association v. Bankcard Holders of America*, 211 U.S.P.Q. 28, 39 (N.D.Cal.1981) (quoting *Louis Rich, Inc. v. Horace W. Longacre, Inc.*, 423 F.Supp. 1327, 1335 (E.D.Pa.1976)). There is no adequate remedy at law for any damage to SEL's goodwill and business reputation by Accolade's alleged copyright and trademark infringement.

## DELAY OR LACHES

The argument that SEL is guilty of laches or that it delayed in seeking injunctive relief thereby "neutralizing" the presumption of irreparable harm is without basis. SEL did not learn that Accolade's games prompted the false Sega Message until September of 1991, when the Genesis III was released. The initial complaint for trademark infringement was filed on October 31, 1991 and amended on November 29, 1991 to include copyright infringement. On November 19, 1991, Judge Peckham issued an order which expedited discovery on SEL's trademark claim and further ordered that preliminary depositions be taken before a motion for preliminary injunction was filed. Transcripts for the depositions were completed on January 21, 1992, and SEL filed its motion for preliminary injunction on February 7, 1991. Thus, SEL has acted promptly in seeking injunctive relief.

## ACCOLADE'S CLAIM FOR FALSE DESIGNATION OF ORIGIN

Accolade alleges that SEL and SOA are liable for false designation of origin under 15 U.S.C. § 1125(a), because the false Sega Message applied the Sega trademark to Accolades' goods against the will of Accolade. Accolade claims that nothing in the Accolade game cartridges causes the false Sega Message to appear, but rather the Genesis III console itself causes the alleged "reverse palming off." As stated above, both parties agree that the false Sega Message is likely to cause confusion.

Accolade has not satisfied its burden of demonstrating serious questions going to the merits much less a likelihood of success on the merits. The evidence presented indicates that the TMSS searches a game cartridge for the "SEGA" trademark which is in the object code; if the code is found the Sega message is displayed on the monitor. Accolade admits that it copied the code and inserted it into its game cartridges, thinking such code was functional. Thus, it is Accolade's actions that are responsible for the displaying of the false Sega Message when its game cartridges are played on the Genesis III.

Moreover, the court is not persuaded that SEL "calculatingly chose to market the modified Genesis console" knowing that Accolades' games were compatible and that the false Sega Message would appear when an Accolade game was inserted. SEL began working on a trademark security system for its coin-operated arcade machines in 1986, and filed its patent applica-

**1402**

tion for the TMSS in March 1990. Accolade did not begin distributing Genesis compatible games until December 1990. In addition, SEL has demonstrated the need to develop its TMSS to prevent piracy. The suggestion that SEL was instead motivated by a desire to cause apparent trademark infringement "as an attempt to create litigation such as this" is not convincing.

CONCLUSION

■ It is therefore ORDERED that Accolade, Inc. its officers, directors, employees, and agents, and all persons in active concert and participation with them who receive actual notice of this order by personal service or otherwise, are enjoined from:

1. Disassembling, translating, converting or adapting the copyrighted object code in SEL's game programs in any manner whatsoever;

2. Using, modifying, enhancing or embellishing SEL's disassembled code in any manner whatsoever;

3. Developing, manufacturing, shipping, distributing or selling any Genesis-compatible video game programs that were derived from, based upon or otherwise created—in whole or in part—by means which included the disassembly, translation, transformation or enhancement of the copyrighted object code in SEL's game programs;

4. Manufacturing, shipping, distributing or selling any Genesis-compatible video game program which prompts the message "PRODUCED BY OR UNDER LICENCE FOR SEGA ENTERPRISES LTD." when inserted in a Genesis console.

IT IS SO ORDERED.